In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-25-00089-CV
_____

CHAD PINKERTON AND THE PINKERTON LAW FIRM, PLLC,
Appellants

V.

MARK KEOUGH, Appellee

On Appeal from the 457th District Court
Montgomery County, Texas
Trial Cause No. 24-10-16036

## MEMORANDUM OPINION

In this accelerated interlocutory appeal, Appellants Chad Pinkerton and the Pinkerton Law Firm, PLLC (Pinkerton Law Firm) appeal the trial court's Order denying their Texas Citizen's Participation Act ("TCPA") motion to dismiss claims for defamation, violation of Texas wiretap laws, tortious interference, civil conspiracy, and intentional infliction of emotional distress filed by Appellee Mark Keough (Keough), the County Judge of Montgomery County and former senior

pastor of The Woodlands Bible Church (the Church). *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 27.001-27.011 (the TCPA), 51.014(a)(12) (authorizing an interlocutory appeal of an order denying a motion to dismiss filed under the TCPA section 27.003). For the reasons explained below, we affirm the trial court's Order denying Appellants' (we refer to Appellants collectively as the Pinkerton Defendants) TCPA motion to dismiss Keough's claims.

## PERTINENT BACKGROUND

Keough's Original Petition

Keough filed an Original Petition against the Pinkerton Defendants and other parties, alleging causes of action for defamation, violation of Texas wiretap laws, tortious interference with fiduciary duty, tortious interference with contract, tortious interference with prospective economic advantage, civil conspiracy, and intentional infliction of emotional distress.[1] Keough alleged that the Pinkerton Defendants, Susan Kenningham (Kenningham), and Wayne Dolcefino (Dolcefino) acted in concert with one another and others when they attempted to extort Keough by using Kenningham's fabricated sexual harassment and related claims against Keough, which Keough maintained were "completely baseless and false." Keough alleged

---

[1] Keough also filed suit against Susan Kenningham, Wayne Dolcefino, Dolcefino Consulting, The Woodlands Bible Church, Larry Albritton, Don Giordano, Scott Leafe, Keith Simpson, Gerry Benzel, Don Carpenter, and Steve Scott, who are not parties to this appeal.

2

that the Pinkerton Defendants sent him an "extortionate demand letter," more than six months after Keough had resigned as pastor of the Church, that was premised on Kenningham's fabricated claims. Keough contends that those claims included false, malicious, and defamatory statements that the Pinkerton Defendants planned to publicize if Keough did not agree to their demands that Keough pay $6.5 million (or liability insurance policy limits if they are lower) and the Church pay $3.5 million (or liability insurance policy limits if they are lower) within sixteen days. Keough alleged that the Pinkerton Defendants and Kenningham hired Dolcefino to compose and publish on the internet defamatory statements to pressure Keough to submit to their "extortionate scheme and to ruin Keough's standing in his community if he refuse[d]."

In the Pinkerton Defendants' letter, which was not only sent to Keough but also to the Church's Board of Elders through a representative member, as well as their insurance broker (not the adjuster), Chad Pinkerton (Pinkerton) demanded an agreement to pay the amounts within sixteen days of receipt of the letter. Pinkerton goes on to state that "should we not come to any agreement, I will be filing a lawsuit and seeking all damages my client is entitled to under Texas law, *including damages that exceed your insured's policy limits*."[2]

---

[2] We note that the Pinkerton Defendants assumed that Heffernan Insurance Brokers were the brokers for the Church's and Keough's liability insurance

But the letter didn't stop there. Pinkerton goes much further. He laces the pages with various footnotes of "allegations" he claims he will make:

[8] The statements herein are "allegations"–not to be considered "true in fact." The investigation into this matter is ongoing. You also have a duty to do your own investigation. That is exactly why I am giving you an opportunity to review *all* the *allegations* contained herein so you may investigate each and provide me with a response. Should you need more time to complete your investigation, I will be happy to grant you an extension of time to respond to this demand. [emphasis original] Nevertheless, in time, the "facts" will be exposed. However, now we are dealing with *mere allegations* so all Parties should be careful as to how they share this information. The information contained herein is, therefore, being dubbed *CONFIDENTIAL*. You should maintain such confidentiality *strictly*. [emphasis original]

[9] Based on information and belief, the office manager [ ] resigned due to unchecked sexual harassment/abuse allegedly perpetrated against her by Pastor Keough. I am in the process of investigating this matter. If true, the Parties will be severely punished in Harris County by a Harris County jury. That's likely to happen anyway, but this would be the final nail in the coffin.

Even though Pinkerton declares the allegations (which he states may or may not be true because he is still investigating) should be "dubbed confidential," he emails copies the same day to Heffernan Insurance Brokers and shares at least some of the information with Dolcefino. He goes on to write:

My job is to expose Pastor Keough and THE WOODLANDS BIBLE CHURCH, correct the wrongdoing, and punish the wrongdoers. I intend to do just that. As a Christian myself, I find the conduct of the involved Parties to be most hideous and shameful. Therefore, this matter will get my full attention.

_____

company. As noted on the final page of the letter, the Pinkerton Defendants sent a copy of the letter to Heffernan Insurance Brokers.

4

Pinkerton continues with more footnoted allegations which he claims are not "truth" but are allegations he is "investigating" and then feigning the requirement of confidentiality even though he sent the letter to the insurance broker (not the insurance adjuster) and shared the allegations with the Church Elders and Dolcefino:

[14] This *Demand* includes explicit and graphic "allegations." I want to emphasize that word: *allegations*. We are in the beginning stages of this investigation. We have learned a lot. We are in the process of confirming what we have learned. However, this is not the time to label things as the "truth." I cannot with *certainty* state that every allegation herein is the truth. To do so would be irresponsible. I can say that I believe in the allegations stated herein, and that belief comes from the investigation my firm and others have conducted. But we have a long way to go before the "truth" is determined. So, no one reading this document should take the allegations herein as the "truth." Further, the Parties should take great care to keep the contents of this document confidential. In fact, I strongly urge all Parties to keep and maintain this document *strictly confidential.* [emphasis in original]

The letter goes on to state:

What will the damages be? This is your opportunity to decide that question–and it will be your *only* opportunity. [emphasis original]

Pinkerton continues with unfounded allegations not relevant to the alleged "sexual harassment" claims which he disseminates to third parties. Concerning Keough's wife, he states:

Pastor Keough's wife is allegedly a "porn ghostwriter." Apparently, this is well-known within certain circles. At this time, I do not have any independent confirmation that such is true. I will continue to investigate this matter and follow up with any findings, if necessary.

Concerning allegations of fraud and theft by Keough, Pinkerton states:

5

An Elder admitted that he was "concerned" that Pastor Keough was using the Church to improperly and/or illegally funnel money to himself and others without tax implications. He also stated that he was "concerned" that he had "used" the Church for improper financial gain–suggesting he may have stolen funds from the Church. At this time, I do not have any independent confirmation that such is true. I will continue to investigate this matter and follow up with any findings, if necessary.

Concerning allegations that Keough physically abused his wife, Pinkerton states:

Pastor Keough's wife often sought shelter at my client's home after being abused (verbally and physically). Pastor Keough would then involve my client, his employee, in trying to "find" his wife–putting my client in a very difficult position to protect an abused lady while trying to keep her job.

Concerning allegations that Keough loaned money to an unidentified couple who could not repay him and Keough forced them into three-way sex, Pinkerton states:

. . . . Pastor Keough (allegedly) coerced the couple into a three-way sex act whereby Pastor Keough had sex with the wife while the husband performed anal sex upon Pastor Keough. . . .

Concerning allegations that a county employee is three months pregnant by Keough. Pinkerton states:

Pastor Keough apparently (allegedly) impregnated a County employee recently. My understanding is the lady is three months pregnant. . . . I am continuing to work on this issue and believe the truth will be exposed.

Concerning allegations Keough paid a prostitute, Pinkerton states:

6

Pastor Keough apparently (allegedly) has a history of engaging in sex acts with prostitutes. I am currently attempting to get a copy of an audio recording whereby a prostitute admits that she had sex with Pastor Keough for money, and he allegedly forced her to say "f[…] me pastor," during the sex act. However, the only information I have on this issue at this time is secondhand speculation. Thus, it cannot be stated it is the "truth." I am continuing to work on this issue and believe the truth will be exposed.

Concerning allegations that a drug dealer delivers drugs to Keough's home, Pinkerton states:

A local drug dealer has come forward claiming that he delivered drugs to Pastor Keough's home. This has yet to be verified. I am continuing to work on this issue. I will supplement this *Demand* with any new information, if necessary. [emphasis original]

Concerning much of this alleged "evidence," which Pinkerton claims not to be taken as "true" but which he claims will "all" come into "evidence," Pinkerton states:

In reading this *Demand*, I am certain individuals are saying to themselves: "much of this is not coming in as evidence at trial." Well, my response is, try me. I am an experienced trial lawyer, and I will ensure that the relevancy burden is met. It is all coming in! [emphasis original]

Concerning the incorporation and inclusion of a video Pinkerton alleges his client hired Dolcefino to make and produce about the allegations, Pinkerton writes that Keough is "a liar," and states:

Pastor Keough needs to be *punished*. I intend to exact that punishment. To be clear on that point, I intend for Pastor Keough to be dead broke at the end of this ordeal–dead ass broke. Bet against me, please! The recorded interview is attached hereto for your review. [emphasis original]

7

After setting out the "allegations" about which he is not saying are "the truth,"

Pinkerton then threatens:

> You, sir, scare me not one bit. It will be an honor and privilege to expose you for the (alleged) scumbag you are. I am the man that is going to take you down. How far down? That is your choice at this time. But this will be your only opportunity to decide *how bad* you want this to be. [emphasis original]

Pinkerton made numerous other threatening statements:

> God help you all should you not settle this case.
> That fact that you have the words "Judge" and "Pastor" before your name makes me sick. The word before your name should be "Inmate."[]
> I am going to see if I can make that change. I hope you did not think this was just about money. It is not. It is about putting you, sir, in your rightful place–down a few pegs to say the least.

> However, *if* you want to resolve this matter now, here is what you can do:

- Tender $6,500,000.00 to my client for a full and final release;
- Resign as County Judge;
- Agree never again to be involved in a church's leadership;
- Publicly admit your wrongs committed against my client while expressing remorse; and
- Agree to a protective order whereby you will not contact or approach my client ever again.

> That, sir, is your way out, you sick bastard.[]Anything less, you are in this for the long haul.

Pinkerton's letter makes additional statements that continue to take on the tone

of extortion:

> So, my client requests that you, the Elders, instruct the carrier in writing to tender the policy in this matter. Should you do that and be

truthful about what transpired, the carrier will tender the policy. Once that occurs, your dog in this fight is done.

You should expect a large verdict in a case like this. Over 100 million dollars is not out of the question considering the facts, my client's injuries, the involved pain and suffering, lost wages, and potential punitive damages. *The risk is real*. Now is the time for you to decide if it is worth the risk. [emphasis original]

Nuclear Verdict Potential

My client's total damages model at trial will exceed $100,000,000.00. I will ask the jury to award $100,000,000.00 in actual damages plus $100,000,000.00 in punitive damages. Please familiarize yourself with the nuclear verdicts in Texas prior to rejecting this demand, which is exactly what I hope you do.

. . . I trust you will inform your insured that a "reasonably prudent person" would settle this case at this time on these terms to avoid an excess judgment that would put their assets at risk. You will cause great harm to yourself and your insured if you do otherwise, including potentially financially ruining your insured and exposing yourself to liability for breach of duties owed to your insured.

In closing, I must reiterate that there is no dispute that your insured is liable for my client's damages in this case (*i.e.,* an ordinarily prudent insurer would accept this Demand). Therefore, to give you enough time to evaluate and respond to this Demand, your option to accept will expire at ***5:00 p.m. CST on September 26, 2024.*** [emphasis original]

The "*Pinkerton Letter*" was dated and emailed to the Church on September 10, 2024, which allowed sixteen days for Keough and the Church to respond.[3]

---

[3] In *G.A. Stowers Furniture Co. v. American Indemnity Co.*, 15 S.W.2d 544, 548 (Tex. 1929), the Texas Supreme Court explained that unreasonably refusing to settle a case within the limits of a liability insurance policy may create a cause of action against the insurer. We note the letter does not meet the requirements of a *Stowers* demand because it imposes conditions other than payment of the limit of

9

In his Original Petition, Keough alleged that Kenningham and Dolcefino obtained some of their source materials by having the elders of the Church secretly record Keough's private confession at the Church and provide Kenningham, Dolcefino, and Pinkerton with the recording. Keough argued the recording of his private confession violated the Texas Civil Wiretap Act, Texas Criminal Wiretap Act, and the Texas Penal Code. Keough stated that the Pinkerton Defendants' demand letter required Keough to resign as County Judge; tender $6.5 million to Kenningham, who had already voluntarily resigned from her position with the Church, in exchange for a release of Kenningham's "baseless employment-related claims" she was threatening to pursue; and to comply with other miscellaneous demands to satisfy Kenningham's, Dolcefino's, and the Pinkerton Defendants' "extortionate demands[.]" Keough argued that the Pinkerton Defendants' demand letter included false and defamatory factual allegations that Pinkerton and Dolcefino threatened to publish and that Pinkerton stated the allegations were "not to be considered 'true in fact.'"

Keough maintained that while working as his assistant, Kenningham became his friend and confidant and set a "trap" for him by causing discord in his marriage. Believing that divorce was inevitable, Keough felt obligated to step down from his

---

the insurance policy limit. *See State Farm Lloyds Ins. Co. v. Maldonado*, 963 S.W.2d 38, 41 (Tex. 1998) (*Stowers* doctrine not triggered unless letter conveys "unconditional offer to settle within policy limits[.]").

role as pastor. After Keough stepped down as pastor, Kenningham complained to the Church that, in the past, when Keough was the pastor, he aggressively pursued a romantic and physical relationship with her despite Kenningham's alleged rejections and protestations. Keough alleged that Kenningham's allegations were fabricated and that she engaged Dolcefino and the Pinkerton Defendants to help her extort money from him. Keough stated that he had confessed his sins at the Church, which included behaviors that disrupted his marriage, including lusting for another woman but not acting on that feeling. Keough alleged that Kenningham, Dolcefino, and the Pinkerton Defendants conspired with elders at the Church to record and provide a copy of Keough's alleged confession without his knowledge or consent.

Keough stated that Dolcefino had used the alleged confession to pressure Keough to agree to an interview to avoid being slandered, but Keough claims that Dolcefino, an investigative journalist, aired a segment, which included a video, with Kenningham's old and new false allegations, along with other allegations, to increase leverage over him. Keough maintained that Pinkerton had appeared in the video and baselessly stated that Keough had sexually harassed Kenningham. The day the segment aired, Pinkerton sent the "*Pinkerton Letter*[]" to Keough and the Church, as the Insured. Keough explained that in the so-called *Pinkerton Letter*, Pinkerton had stated that the statements in the letter were "'allegations'" that should "not [] be taken as the "'truth[;]'" that Pinkerton agreed that Pinkerton could not

11

"with *certainty* state that every allegation herein is the truth[;]" that Pinkerton stated the "'allegations'" are based on "'information and belief;'" and Pinkerton says only he "believe[s] in the allegations stated herein[.]" Keough maintained that the Pinkerton Defendants' *Pinkerton Letter* is nothing more than an attempt to criminally extort him and it contains false allegations and a threat to further publicize defamatory allegations to scare Keough to pay blackmail. Keough attached a copy of the *Pinkerton Letter* to his First Amended Petition.

Concerning his defamation causes of action against the Pinkerton Defendants, Keough alleges in his First Amended Petition that the Pinkerton Defendants defamed him by publishing numerous defamatory and false statements of fact about him, and that the Pinkerton Defendants had actual knowledge of the falsity of the statements or made the statements with reckless disregard for the truth. Keough argues that many of the statements are defamatory per se, including allegations that he committed adultery and domestic violence, broke laws, and failed to tender honest and reasonable services as County Judge. Keough alleged that the Pinkerton Defendants acted with malice and caused him to sustain damages.

In his civil conspiracy claim, Keough alleged that "each defendant was a member of a combination," the object of which was the commission of the intentional tort to defame him. Keough alleged that each member of the combination, which includes the Pinkerton Defendants, committed an overt, unlawful act in

12

furtherance of the object of the combination which contributed to or constituted an intentional tort. Keough alleged that he suffered damages as a proximate and direct result of the commission of the intentional tort.

Keough maintained that he was entitled to recover reasonable and necessary attorney's fees under the Texas Civil Practice and Remedies Code and the Texas Code of Criminal Procedure.

The Pinkerton Defendants' Answer and Motion to Dismiss under the TCPA

The Pinkerton Defendants filed an Answer, asserting a general denial and affirmative defenses, including, among others, the defenses of legal justification, privilege, truth, and substantial truth. The Pinkerton Defendants affirmatively asserted that the challenged statements are protected by free speech and the rights to petition and association. *See id.* § 27.002; *In re Lipsky*, 460 S.W.3d 579, 586 (Tex. 2015) (orig. proceeding). The Pinkerton Defendants stated that the challenged statements were published as an exercise of his right to petition courts and elected officials and dealt with matters of legitimate public concern. The Pinkerton Defendants maintained that Keough's claims were barred by the judicial-proceeding privilege, doctrine of attorney immunity, and common-law qualified immunity.

The Pinkerton Defendants filed a Motion to Dismiss under the TCPA, arguing Keough's claims must be dismissed because his lawsuit is part of a strategy to silence Pinkerton and Kenningham and prevent them from exercising their constitutional

13

rights to free speech and to petition. The Pinkerton Defendants argued that all Keough's claims against them tie directly to conduct taken on behalf of Kenningham in prosecution of her just claims against Keough. The Pinkerton Defendants maintained that the TCPA mandates dismissal of Keough's claims because Keough cannot present clear and specific prima facie evidence to support his claims, which are barred by the defenses of attorney immunity and judicial-proceeding privilege. The Pinkerton Defendants argued that sending the *Pinkerton Letter* and publicizing Kenningham's claims for sexual harassment against Keough fall within the scope of an attorney's duty to zealously represent his client and were performed in contemplation of and before judicial proceedings.

The Pinkerton Defendants explained that, when they sent the *Pinkerton Letter*, Pinkerton appeared in a video news release produced by Dolcefino Consulting, an investigative media company. The video discussed Keough's resignation from the Church, and Keough voluntarily appeared in the video and discussed Kenningham's sexual harassment allegations against him. Pinkerton also appeared in the video and discussed the nature of Kenningham's claims against Keough and the Church. Pinkerton stated Keough's behavior was "pretty disgusting[,]" that he abused his Church position, and that the Church ignored the victim and allowed sexual harassment to continue during her employment by the senior pastor. Pinkerton explained that after Keough received the *Pinkerton Letter*,

14

Keough filed his lawsuit against the Pinkerton Defendants in which Keough alleged that the *Pinkerton Letter* was an extortion letter. In his suit, Keough complained that Pinkerton appeared in the video and made statements without basis in fact to pressure Keough to submit to the Pinkerton Defendants' alleged extortionate demand. The Pinkerton Defendants argued that each of Keough's claims against them is subject to the TCPA because the claims are premised on their having published defamatory and false statements in the *Pinkerton Letter* and the internet video. The Pinkerton Defendants maintained that the acts were based on or in response to their exercise of their constitutional rights.

The Pinkerton Defendants maintained that Keough's lawsuit against them is based on or in response to their exercise of free speech rights, which includes any communication made in connection with a matter of public concern. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.002. The Pinkerton Defendants explained that the TCPA broadly defines a "matter of public concern" as a statement regarding a public official, public figure, or other person who has drawn substantial public attention due to the person's official acts, fame, notoriety, or celebrity; a matter of political, social, or other interest to the community; or a subject of concern to the public. *See id.* § 27.001(7); *Morris v. Daniel*, 615 S.W.3d 571, 576 (Tex. App.—Houston [1st Dist.] 2020, no pet.). The Pinkerton Defendants stated that the *Pinkerton Letter* alleges that Keough made "thinly veiled threats against [Kenningham] based on his

status in the community[,]" and in the video Pinkerton stated that Keough "'utilized his position within a church' to pursue Ms. Kenningham." The Pinkerton Defendants argued that as a previous politician, current County Judge, and founder and prior senior pastor of the Church, Keough is a public official, public figure, or other person who has drawn substantial public attention (although Keough was not a candidate at the time of the letter). The Pinkerton Defendants also argued that the statements about Keough's misconduct while holding office addressed matters of political, social, or other interest to the community or a subject of concern to the public. The Pinkerton Defendants noted that the allegations against Keough are relevant beyond the parties to the lawsuit because Keough abused his position as employer, pastor, and public official by making inappropriate sexual advances toward Kenningham and such abuse bears directly on his character and fitness for office.

The Pinkerton Defendants argued that Keough's lawsuit against them is based on or in response to their exercise of the right to petition. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.001(4). The Pinkerton Defendants explained Keough's claims against them concern alleged misconduct while representing their client, Kenningham. The Pinkerton Defendants noted that the TCPA defines the right to petition to include any other communication that falls within the protection of the right to petition government under the Constitution of the United States or the constitution of this state. *See id.* § 27.001(4)(E). The Pinkerton Defendants argued

16

the right to petition applies to the pre-suit *Pinkerton Letter*, which demanded that Keough's and the Church's liability insurers pay policy limits for Kenningham's claims and threatened suit if such demands were not met. *See Long Canyon Phase II & III Homeowners Ass'n, Inc. v. Cashion*, 517 S.W.3d 212, 220 (Tex. App.—Austin 2017, no pet.); *Moricz v. Long*, No. 06-17-00011-CV, 2017 WL 3081512, at *4 (Tex. App.—Texarkana July 20, 2017, no pet.) (mem. op.); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 27.001(4)(E). Regarding Pinkerton's appearance in the video, the Pinkerton Defendants argued that Pinkerton was promoting Kenningham's claims against Keough and the Church, and as such his conduct falls within the "ambit of 'publicity and threats of litigation'" covered by the right to petition. *See Coastal States Mktg., Inc. v. Hunt*, 694 F.2d 1358, 1367 (5th Cir. 1983).

The Pinkerton Defendants maintained that Keough could not meet his burden to establish a prima facie case for the essential elements of his claims. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.005(c). Concerning Keough's defamation claim, the Pinkerton Defendants stated that since Keough is a public official or public figure, Keough must show that (1) the Pinkerton Defendants published a statement, (2) that was defamatory concerning Keough, and (3) while acting with actual malice. *See Dworschak v. Transocean Offshore Deepwater Drilling, Inc.*, 352 S.W.3d 191, 198 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (citing *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998)). The Pinkerton Defendants argued

17

that true statements and statements of mere opinion are statements that are not defamatory because they cannot be verifiable as false, and the Pinkerton Defendants maintained that the statements about which Keough complains are either substantially true or an expression of mere opinion. *See Scripps NP Operating, LLC v. Carter*, 573 S.W.3d 781, 794-95 (Tex. 2019). The Pinkerton Defendants explained that actual malice means that the statement was made with knowledge that it is false or with reckless disregard of whether it is true, and the Pinkerton Defendants argued Keough could not meet his burden to show they acted with actual malice. *See Burbage v. Burbage*, 447 S.W.3d 249, 254 (Tex. 2014).

Keough's claim for civil conspiracy required him to show (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result. *Henkel v. Emjo Invs., Ltd.*, 480 S.W.3d 1, 7 (Tex. App.—Houston [1st Dist.] 2015, no pet.). The Pinkerton Defendants argued that Keough cannot make a prima facie showing of a civil conspiracy. The Pinkerton Defendants explained that civil conspiracy is a derivative tort that requires a separate underlying tort that has caused damages, and the Pinkerton Defendants argued that Keough cannot support any of his independent tort claims with prima facie evidence. *See Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 142 (Tex. 2019).

18

The Pinkerton Defendants further argued that even if Keough could make a prima facie showing of the elements of his claims, it would not matter, because the Pinkerton Defendants' actions were done in the course and scope of representing Kenningham. The Pinkerton Defendants concluded that their defenses of attorney immunity and judicial privilege bar Keough's claims. The Pinkerton Defendants argued that the TCPA required the trial court to dismiss Keough's claims, render judgment that Keough take nothing against the Pinkerton Defendants, award the Pinkerton Defendants their costs and attorney's fees, and sanction Keough and his counsel.

The Pinkerton Defendants offered the following evidence in support of their Motion to Dismiss: Keough's First Amended Petition, the *Pinkerton Letter*, and Pinkerton's Declaration. In his Declaration, Pinkerton stated that before he sent the *Pinkerton Letter* and appeared in the video, Kenningham hired the Pinkerton Law Firm to represent her in a potential lawsuit against Keough. He stated that he prepared the *Pinkerton Letter* and appeared in the video in the course and scope of representing Kenningham and solely to help prosecute Kenningham's claims against Keough. Pinkerton maintained that he did not participate in the creation, planning, editing, or other production of the video. He stated that he did not hire Dolcefino, Dolcefino Consulting, or any other person to produce or create the video, and he did not have any involvement in Keough's interview, which occurred before he met with

19

Kenningham and learned about her claims. Pinkerton explained that he was not involved in the alleged recording of Keough's statement of resignation to the elders of the Church, which also took place before he met with Kenningham.

<u>Keough's Response to the Pinkerton Defendants'</u>
<u>Motion to Dismiss under the TCPA</u>

Keough filed a Response to the Pinkerton Defendants' Motion to Dismiss under the TCPA, arguing that his claims are not subject to the TCPA, and even if they were, Keough maintained that he established a prima facie case for all his claims and that the Pinkerton Defendants failed to establish the affirmative defenses of attorney immunity or the judicial-proceedings privilege. Keough stated that the Pinkerton Defendants had not shown that Keough's claims arise from the Pinkerton Defendants' exercise of their rights of free speech and to petition. Keough argued that the Pinkerton Defendants' statements are not communications made in connection with a matter of public concern and that not all Keough's claims arise from a "communication." Keough stated that it is not enough that a plaintiff is a public official, because Texas courts apply general-purpose and limited-purpose-public-figure tests to determine whether the TCPA applies to a given statement. *See McLemore*, 978 S.W.2d at 571; *Rodriguez v. Gonzales*, 566 S.W.3d 844, 850-51 (Tex. App.—Houston [14th Dist.] 2018, pet. denied).

Keough argued that he is not a general-purpose public figure because at that time he had not achieved such pervasive fame or notoriety that he had become a

public figure for all purposes and in all contexts. *See McLemore*, 978 S.W.2d at 571; *San Antonio Express News v. Dracos*, 922 S.W.2d 242, 251 (Tex. App.—San Antonio 1996, no pet.). Keough argued that he is not a limited-purpose public figure, which requires that (1) the controversy at issue must be public in the sense that people are discussing it and that people who are not participants in the controversy are likely to feel the impact of the controversy's resolution, (2) the plaintiff's role in the controversy must be more than trivial or tangential, and (3) the alleged defamation must be germane to the plaintiff's participation in the controversy at issue. *See McLemore*, 978 S.W.2d at 571; *Rodriguez*, 566 S.W.3d at 850. Keough argued that a defendants' defamatory conduct placing a private matter before the public cannot make the plaintiff a public figure and that the Pinkerton Defendants' statements cannot be what brought the controversy into the public view or interest. *See Neely v. Wilson*, 418 S.W.3d 52, 71 (Tex. 2013); *see also Hutchison v. Proxmire*, 443 U.S. 111, 135 (1979).

Keough argues that the Pinkerton Defendants' defamatory publications brought the private matter into the public sphere, and that but for the Pinkerton Defendants' conduct, the only people who might have discussed the controversy were the people directly involved. Keough maintained that no one, other than the participants in the controversy, was likely to feel the impact of its resolution. Keough explained that the TCPA requires that the communication be relevant to the public

at the time it was made, and his fitness for office was not temporally relevant because he was not a candidate asking for public support at that time. *See McLane Champions, LLC v. Hous. Baseball Partners LLC*, 671 S.W.3d 907, 916-17 (Tex. 2023); *Rodriguez*, 566 S.W.3d at 848; *Klentzman v. Brady*, 312 S.W.3d 886, 905 (Tex. App.—Houston [1st Dist.] 2009, no pet.). Thus, there was no temporal connection between the defamatory statements and any matter of public concern.

Keough maintains that his claim for civil conspiracy does not involve a "communication" made in connection with a matter of public concern and falls outside the TCPA's reach. Keough notes that the elements of civil conspiracy do not require proof of any communication. *See Agar Corp., Inc.*, 580 S.W.3d at 141. Keough also notes that a claim for civil conspiracy is not an independent tort and that it is connected to the underlying tort and survives or fails along with it.

Keough argued that the right to petition is not implicated because there was no pending judicial proceeding when the Pinkerton Defendants made their statements. Keough stated at the hearing on the TCPA motion that no charge of sexual harassment had been filed within the jurisdictional time frame (within 180 days of the last discriminatory act alleged to have been committed by Keough against Kenningham) as required by the Texas Labor Code and the Equal Employment Opportunity Act (EEO). *See* Tex. Lab. Code Ann. § 21.201(a)-(c); 42 U.S.C. § 2000e-2. Keough argued the *Pinkerton Letter* does not implicate the Pinkerton

22

Defendants' right to petition the government because there were no issues under consideration by a judicial body with which it could have been connected, and no discrimination charge had been filed. Keough maintained that the *Pinkerton Letter* does not constitute a communication in or pertaining to a judicial proceeding because there was no pending proceeding. *See Levatino v. Apple Tree Café Touring, Inc.*, 486 S.W.3d 724, 728-29 (Tex. App.—Dallas 2016, pet. denied); *see also Mattress Firm, Inc. v. Deitch*, 612 S.W.3d 467, 486 (Tex. App.—Houston [1st Dist.] 2020, pet. denied). Keough argued the baseless *Pinkerton Letter* was a "sham petition" that cannot implicate the right to petition the government because it was an extortionate attempt disguised as settlement negotiations concerning a purely private matter.

Concerning his claims, Keough initially stated that he opposed the dismissal of his claims against the Pinkerton Defendants for the violation of Texas wiretap laws, tortious interference with fiduciary duty, tortious interference with contract, tortious interference with prospective economic advantage, and intentional infliction of emotional distress. However, Keough also admitted that, if the trial court did not grant his request for limited discovery, and the TCPA applied to this case, then he did not have sufficient evidence to oppose the dismissal of his claims for violation of the Texas wiretap laws, tortious interference with contract, and tortious interference with prospective economic advantage. The trial court's docket sheet shows the trial court denied Keough's Motion for Expedited Discovery.

23

However, Keough's point is that the TCPA does not apply to his causes of action at all. Keough attached the following evidence to his Response: Keough's Declaration, Keough's "Private Confession," Keough's First Amended Petition, the *Pinkerton Letter*, Declaration of Bruce Allegar, Declaration of Lucile Landis, and the transcript of the video.

In his Declaration, Keough denied the allegations against him, including Pinkerton's statement in the video that Keough used his position in the Church to sexually harass Kenningham. Keough stated that the Pinkerton Defendants and others published false and defamatory statements in the video to damage his reputation and career. Keough stated that the Pinkerton Defendants' *Pinkerton Letter* "is replete with nine-figure numbers . . . but contains no cause of action." Keough stated the Pinkerton Defendants demanded $6.5 million or policy limits and Keough's resignation as County Judge, a promise to never lead a church, and a public admission to the *Pinkerton Letter*'s falsehoods for the false harassment allegations by Kenningham, and the Pinkerton Defendants also threatened to demand and recover $200 million. Keough explained that Pinkerton admitted in the *Pinkerton Letter* that he wanted Keough to be "dead broke" and "in jail[,]" and the Pinkerton Defendants included false allegations unrelated to Kenningham's allegations.

The Pinkerton Defendants' Reply to Keough's Response to his Motion to Dismiss

The Pinkerton Defendants filed a Reply to Keough's Response to his Motion to Dismiss, arguing that Keough's claims about the *Pinkerton Letter* are not actionable under Texas law and are designed to silence the Pinkerton Defendants in their efforts to pursue Kenningham's valid claims against Keough. The Pinkerton Defendants argued the trial court should grant their TCPA motion and dismiss the claims Keough admitted that he has no evidence to support and award them attorney's fees for those claims. The Pinkerton Defendants maintained that the TCPA applies to Keough's remaining claims of defamation and civil conspiracy because the *Pinkerton Letter* and Pinkerton's video appearance qualify as exercises of the right of free speech under the TCPA. The Pinkerton Defendants explained that the TCPA defines a matter of public concern to include statements regarding a public official, public figure, or other person who has drawn substantial public attention, and that Keough's status as a public official is sufficient to invoke the TCPA. The Pinkerton Defendants argued that it was Keough's position as an elected official that places him in the public eye and not anything that the Pinkerton Defendants said about Keough. The Pinkerton Defendants argued that the citizens of Montgomery County have a right to know about the character and misdeeds of their public officials, because it is a matter of great public concern. *See Polk Cnty. Publ'g Co. v. Coleman*, 685 S.W.3d 71, 76 (Tex. 2024).

The Pinkerton Defendants also reiterated the argument that their alleged conduct constituted an exercise of the right to petition, which includes pre-suit demand letters. *See Cashion*, 517 S.W.3d at 220; *Moricz*, 2017 WL 3081512, at *4; *see also Mattress Firm, Inc.*, 612 S.W.3d at 486-87. The Pinkerton Defendants argued the *Pinkerton Letter* was not a "sham" and included references to documents supporting Kenningham's sexual harassment allegations, which are not so objectively baseless that no reasonable litigant could expect success on the merits. The Pinkerton Defendants also argued Keough failed to meet his burden to show a prima facie case for each essential element of his claims for defamation and civil conspiracy. The Pinkerton Defendants acknowledged that their defenses of attorney immunity and the judicial-proceeding privilege bar Keough's claims based on the *Pinkerton Letter* but not the video, and the Pinkerton Defendants concluded it does not matter because Keough cannot make a prima facie case to support his claims.

 TCPA Hearing and the Trial Court's Order

The trial court conducted a hearing during which it considered the parties' oral arguments about the dismissal of Keough's claims under the TCPA. Keough's counsel stated that there were several claims Keough was not able to pursue without allowing for discovery. Keough's counsel explained that, concerning the Pinkerton Defendants, Keough contested the dismissal of his claims because the TCPA did not apply. After considering the Pinkerton Defendants' Motion to Dismiss under the

TCPA, Keough's Response, any replies, evidence, and the arguments of counsel, the trial court denied Keough's motion for discovery and denied the Pinkerton Defendants' Motion to Dismiss under the TCPA. The Pinkerton Defendants filed this interlocutory appeal.

## STANDARD OF REVIEW

We review a trial court's denial of a TCPA motion to dismiss de novo. *See Adams v. Starside Custom Builders, LLC*, 547 S.W.3d 890, 897 (Tex. 2018); *Walker v. Hartman*, 516 S.W.3d 71, 79-80 (Tex. App.—Beaumont 2017, pet. denied). We consider the pleadings, evidence we could consider under Rule 166a, and affidavits stating facts on which liability or any defense is based in the light most favorable to the nonmovant. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.006(a); *In re Lipsky*, 460 S.W.3d at 587; *see also Dall. Morning News, Inc. v. Hall*, 579 S.W.3d 370, 377 (Tex. 2019) (citation omitted); *Nobles v. United States Precious Metals, L.L.C.*, No. 09-19-00335-CV, 2020 Tex. App. LEXIS 2553, at *5 (Tex. App.—Beaumont Mar. 26, 2020, pet. denied). We also review de novo whether the parties met their burdens of proof under section 27.005 of the TCPA. *See Landry's, Inc. v. Animal Legal Def. Fund*, 631 S.W.3d 40, 45-46 (Tex. 2021) (citation omitted); *Hall*, 579 S.W.3d at 377.

## TCPA FRAMEWORK

The TCPA is meant "to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government *to the maximum extent permitted by law* and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury." Tex. Civ. Prac. & Rem. Code Ann. § 27.002 (emphasis added). The TCPA instructs courts to liberally construe it to ensure its stated purpose and intent are fully effectuated, but it "does not abrogate or lessen any other defense, remedy, immunity, or privilege available under other constitutional, statutory, case, or common law or rule provisions." *See id.* § 27.011(a), (b); *ExxonMobil Pipeline Co. v. Coleman*, 512 S.W.3d 895, 898 (Tex. 2017) (citation omitted) (noting directive to liberally construe). Under the TCPA, a party may move to dismiss a "legal action" that is "based on or is in response to a party's exercise of the right of free speech, right to petition, or right of association[.]" Tex. Civ. Prac. & Rem. Code Ann. § 27.003(a); *see also Creative Oil & Gas, LLC v. Lona Hills Ranch, LLC*, 591 S.W.3d 127, 131 (Tex. 2019). The TCPA defines the "[e]xercise of the right of free speech" as "a communication made in connection with a matter of public concern." Tex. Civ. Prac. & Rem. Code Ann. § 27.001(3); *see Montano v. Cronan*, No. 09-20-00232-CV, 2021 WL 2963801, at *4 (Tex. App.—Beaumont July 15, 2021, no pet.) (mem. op.).

28

The TCPA "provides a three-step process for the dismissal of a 'legal action' to which it applies." *Montelongo v. Abrea*, 622 S.W.3d 290, 296 (Tex. 2021) (citing *Castleman v. Internet Money Ltd.*, 546 S.W.3d 684, 691 (Tex. 2018)); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 27.005(b)-(d). First, the movant bears the initial burden to "demonstrate[] that the legal action is based on or is in response to[ ]" the movant's exercise of: "(A) the right of free speech; (B) the right to petition; or (C) the right of association[.]" Tex. Civ. Prac. & Rem. Code Ann. § 27.005(b)(1)(A)-(C). If the movant establishes that the nonmovant's claim implicates one of these rights, the burden shifts to the nonmovant to "'establish[ ] by clear and specific evidence a prima facie case for each essential element of the claim in question.'" *Lipsky*, 460 S.W.3d at 587 (quoting Tex. Civ. Prac. & Rem. Code Ann. § 27.005(c)). A "prima facie case" means "evidence sufficient as a matter of law to establish a given fact if it is not rebutted or contradicted." *Id.* at 590 (citation omitted). It is the "'minimum quantum of evidence necessary to support a rational inference that the allegation of fact is true.'" *Id.* (quoting *In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d 218, 223 (Tex. 2004)). Clear and specific evidence means that the "plaintiff must provide enough detail to show the factual basis for [his] claim." *Id.* at 591. Finally, if the nonmovant establishes his prima facie case, the burden shifts back to the movant to establish each essential element of an affirmative defense by a preponderance of the evidence. Tex. Civ. Prac. & Rem. Code Ann. § 27.005(d);

29

*Youngkin v. Hines*, 546 S.W.3d 675, 679-80 (Tex. 2018); *Coleman*, 512 S.W.3d at 899.

## ANALYSIS

In issue one, the Pinkerton Defendants argue the trial court erred by failing to find that the TCPA applies to Keough's legal action. The Pinkerton Defendants contend that they satisfied their burden to show the TCPA applies to Keough's claims, which are based on or in response to the Pinkerton Defendants' exercise of their constitutional rights of free speech and to petition. The Pinkerton Defendants argue that exercise of free speech includes any communication made in connection with a matter of public concern, and that statements that concern a public official or public figure are sufficient to be a matter of public concern. According to the Pinkerton Defendants, "[i]f a suit is made by a government official and the statements on which the suit is based allege misconduct against that official, no other facts are needed for the TCPA to apply." The Pinkerton Defendants argue the TCPA would also apply if a suit is based on statements about a plaintiff who is a public figure, even to only a subset of the public.

Keough argues that the TCPA does not protect criminal conduct and that the Pinkerton Defendants' conduct, which includes the "*Pinkerton Letter*" and related video appearance, constitutes attempted extortion for the sole purpose of obtaining money through coercion and is not an exercise of the right of free speech under the

30

TCPA. According to Keough, the TCPA exists to protect constitutional rights, and extortion is not protected by the First Amendment. *See* Tex. Penal Code Ann. §§ 31.01(1)(A) (Definition of Deception), 31.03(a) (Theft); *see also id.* §§ 1.07(a)(9) (C), (D), (E) (Definition of Coercion), 15.01 (Criminal Attempt). Keough contends that the Pinkerton Defendants' attempted extortionary conduct included threatening to accuse Keough of a crime, exposing him to ridicule, and destroying his reputation unless Keough agreed to pay $6.5 million within sixteen days. Keough argues that the Pinkerton Defendants' *Pinkerton Letter*, claiming up to $200 million in damages, is multitudes beyond any claim for damages that Kenningham could legitimately recover for an alleged claim of sexual harassment, and the Pinkerton Defendants' extraneous allegations and additional threats in the *Pinkerton Letter* to destroy Keough's reputation have no nexus to Kenningham's claims. Keough maintains that even though Pinkerton did not advance all the alleged falsehoods during his appearance in the video, the Pinkerton Defendants did not segregate the protected conduct from the unprotected, and Pinkerton's appearance was "part and parcel of the extraordinary threats he made in the demand letter."

Keough argues that the Pinkerton Defendants' extortionary *Pinkerton Letter*, which did not contain any mention of a legitimate cause of action, is also not protected petitioning activity because the TCPA does not protect "sham litigation[,]" which is not genuinely aimed at procuring a favorable governmental action. Keough

contends that the Pinkerton Defendants' *Pinkerton Letter* is an objectively baseless and barely disguised attempt to obtain money and to directly harm him and that no reasonable litigant could realistically expect success being predicted at a trial on the merits. According to Keough, the *Pinkerton Letter* failed to identify a legitimate cause of action or describe the basis of any supposed liability, and the only conclusion that can be drawn is that the Pinkerton Defendants sent the letter purely for harassment and extortion and not as a legitimate exercise of free speech.

In determining whether the Pinkerton Defendants met their burden to demonstrate that Keough's claims were based on the Pinkerton Defendants' exercise of their rights of free speech and to petition, we consider the pleadings, evidence a court could consider under Texas Rule of Civil Procedure 166a, and any supporting and opposing affidavits. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.006(a). "We decide the applicability of the TCPA based on 'a holistic review' of the pleadings and supporting and opposing affidavits." *Montano*, 2021 WL 2963801, at *4 (citing *Adams*, 547 S.W.3d at 897). "We consider these materials in the light most favorable to the nonmovant, and we favor the conclusion that claims are not predicated on protected expression." *Moore v. Shaw*, No. 05-22-01148-CV, 2024 Tex. App. LEXIS 1976, at **3-4 (Tex. App.—Dallas Mar. 20, 2024, no pet.) (mem. op.). The TCPA defines the "[e]xercise of the right of free speech" as "a communication made

in connection with a matter of public concern." Tex. Civ. Prac. & Rem. Code Ann. § 27.001(3).

The TCPA further defines "[m]atter of public concern" as:

. . . a statement or activity regarding:

(A) a public official, public figure, or other person who has drawn substantial public attention due to the person's official acts, fame, notoriety, or celebrity;

(B) a matter of political, social, or other interest to the community; or

(C) a subject of concern to the public.

*Id.* § 27.001(7). "The phrase 'matter of public concern' commonly refers to matters 'of political, social, or other concern to the community,' and a subject of general interest and of value and concern to the public, as opposed to purely private matters." *Montano*, 2021 WL 2963801, at *4; *see also Creative Oil*, 591 S.W.3d at 135 (quoting *Brady*, 515 S.W.3d at 884). "A 'matter of public concern' includes an issue related to health or safety[.]" *MediaOne, L.L.C. v. Henderson*, 592 S.W.3d 933, 940 (Tex. App.—Tyler 2019, pet. denied). "Public matters include, among other things, 'commission of crime, prosecutions resulting from it, and judicial proceedings arising from the prosecutions.'" *Brady*, 515 S.W.3d at 884 (citation omitted). For all the rights protected under the TCPA, the statute defines "[c]ommunication" as "the making or submitting of a statement or document in any form or medium, including

33

oral, visual, written, audiovisual, or electronic." Tex. Civ. Prac. & Rem. Code Ann. § 27.001(1).

The "[e]xercise of the right to petition" includes "any other communication that falls within the protection of the right to petition government under the Constitution of the United States or the constitution of this state." *Id.* § 27.001(4)(E); *see* U.S. CONST. amend. I ("Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances."); Tex. Const. art. I, § 27 ("The citizens shall have the right . . . [to] apply to those invested with the powers of government for redress of grievances or other purposes, by petition, address or remonstrance."). A demand letter that includes meritless claims made in bad faith is an act of "sham petitioning" and is a category of speech that falls outside the protection of the First Amendment because the allegations are "objectively baseless[;]" such that "'no reasonable litigant could realistically expect success on the merits.'" *Cashion*, 517 S.W.3d at 221-22 (citation omitted); *see Avire, LLC v. Priority I Aviation Inc.*, No. 14-21-00172-CV, 2022 WL 1010374, at *6 (Tex. App.—Houston [14th Dist.] 2022, no pet.). Additionally, statements made between parties during potential settlement negotiations in advance of any litigation being filed are "'purely private matters' and do not implicate a party's constitutional right to petition the government for redress of grievances." *Mattress Firm, Inc.*, 612

34

S.W.3d at 488 (citing *Creative Oil & Gas, LLC*, 591 S.W.3d at 135); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 27.001(4)(E).

A Demand Letter sent pursuant to the *Stowers* doctrine should contain allegations that "(1) the claim is within the scope of coverage; (2) a demand [is being] made that [is] within policy limits; and (3) the demand [is] such that an ordinary, prudent insurer would [] accept[] it, considering the likelihood and degree of the insured's potential exposure to an excess judgment." *Seger v. Yorkshire Ins. Co.*, 503 S.W.3d 388, 395-96 (Tex. 2016). Although the Pinkerton Defendants described the letter as a "*Stowers Letter*," the allegations contained in the letter do not set forth the specific damages that their client is entitled to recover which are covered by the alleged insurance policy, how those damages are calculated, how those damages are covered by the policy, how any damages may exceed the policy limits, or how any potential damages Kenningham could have, if proven, could exceed $10 million. The twenty-eight-page letter, with additional attachments, contains personal attacks and salacious allegations. The letter demands an agreement within sixteen days of receipt.

Keough argues that the sending of the letter to third parties, in combination with appearing in the "Sins of a Pastor" production aired by Dolcefino the same day that Pinkerton sent the *Pinkerton Letter* (and included the video as an exhibit to the *Pinkerton Letter*), amounts to criminal extortion considering the urgent demand to

35

agree to the payment of $10 million or the policy limits of Keough and the Church's liability insurance policy. Extortion is a form of theft as defined under the Penal Code. Tex. Pen. Code Ann. § 31.02. The Texas Penal Code defines theft as "unlawfully appropriating property with intent to deprive the owner of the property." *Id.* § 31.03(a). "Property" includes money. *Id.* § 31.01(5)(C). Extortion, or attempted extortion, is theft when one attempts to obtain property "induced by deception or coercion[.]" *Id.* §§ 31.01(3)(A), 31.03(a); *see also id.* § 15.01 (defining attempt). "Coercion" includes threats "to accuse a person of any offense[,] to expose a person to hatred, contempt or ridicule[,]" or "to harm the credit or business repute of any person[.]" *Id.* § 1.07(a)(9)(C), (D), (E).

We conclude that the Pinkerton Defendants' communications in the *Pinkerton Letter* and video are not protected speech under the First Amendment when viewed in the light most favorable to the nonmovant. A holistic view of the pleadings and evidence submitted shows the letter and video could reasonably be construed as containing an attempt to extort money and concessions from Keough and the insurance carrier in millions of dollars. There was no lawsuit or Charge of Discrimination pending at the time the *Pinkerton Letter* was published to third parties. The letter does not merely demand a sum of money in exchange for which a claim would be settled; it threatens to "expose" Keough and to take him "down a few pegs" by "ensur[ing]" that "all" the allegations contained in the letter would be

36

made public unless Keough were to resign as county judge, agree never to serve in a church leadership position, admit to wrongdoing while showing remorse, and agree to a protective order, and unless the insurance company were to pay $10 million, all within 16 days. In construing the TCPA, we are mindful of its fundamental purpose, which is to encourage and safeguard the constitutional rights of persons to petition and speak freely to the maximum extent permitted by law and to protect the rights of a person to file meritorious suits for demonstrable injury. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.002. However, the First Amendment does not protect "'speech integral to criminal conduct[]'" or speech that is the "'very vehicle' of a crime itself." *Sanchez v. Striever*, 614 S.W.3d 233, 244 (Tex. App.—Houston [14th Dist.] 2020, no pet.) (citing *U.S. v. Alvarez*, 567 U.S. 709, 717-18 (2012)); *Leachman v. Stephens*, No. 02-13-00357-CV, 2016 WL 6648747, at *18 (Tex. App.—Fort Worth Nov. 10, 2016, pet. denied) (mem. op.) (op. on reh'g). "[T]here is no constitutional right to engage in criminal behavior or commit civil wrongs." *Sanchez*, 614 S.W.3d at 244 (citing *Bandin v. Free & Sovereign State of Veracruz de Ignacio de la Llave*, 590 S.W.3d 647, 653 (Tex. App.—Houston [14th Dist.] 2019, pet. denied)). Thus, only law-abiding participation comes within the TCPA's purview. *Id.* at 245; *Grant v. Finecy*, No. 02-23-00310-CV, 2023 WL 8940395, at *7 (Tex. App. —Fort Worth Dec. 28, 2023, no pet.) (mem. op.).

Because the Pinkerton Defendants' conduct may have constituted an attempt to extort Keough, we conclude that by sending the so-called *Pinkerton Letter*, which threatened to defame and ruin Keough, demanding that Keough pay money in order to avoid defamation, and by appearing in the video, which could be construed as an action to further the conspiracy to defame Keough, the Pinkerton Defendants have not established that they were exercising a right of free speech or the right to petition under the TCPA. *See Sanchez*, 614 S.W.3d at 244. The Pinkerton Defendants have failed to meet their burden to demonstrate that their threatening communications, which may have amounted to criminal conduct (attempted extortion), are protected communications within the meaning of the TCPA. *See Whitelock v. Stewart*, 661 S.W.3d 583, 606 (Tex. App.—El Paso 2023, pet. denied); *Pena Garza v. Vaughn*, No. 13-23-00134-CV, 2024 WL 4707814, at *4 (Tex. App.—Corpus Christi-Edinburg Nov. 7, 2024, pet. denied) (mem. op.); *Grant*, 2023 WL 8940395, at *7; *Bandin*, 590 S.W.3d at 653. Accordingly, the Pinkerton Defendants' communications are not protected speech under the First Amendment because they include "'speech integral to criminal conduct[]'" or speech that is the "'very vehicle' of a crime itself." *Sanchez*, 614 S.W.3d at 244 (citing *Alvarez*, 567 U.S. at 717-18); *Leachman*, 2016 WL 6648747, at *18.

We agree with the trial court and conclude the Pinkerton Defendants failed to meet their burden to "demonstrate" the legal action brought by Keough "is based on

or is in response to" the Pinkerton Defendants' "exercise" of their rights of free speech and to petition. *See* Tex. Civ. Prac. & Rem. Code Ann. § 27.005(b)(1)(A), (B). Thus, the TCPA does not apply, and the trial court did not err by denying the Pinkerton Defendants' Motion to Dismiss. *See id.* We overrule issue one. Since the Pinkerton Defendants failed to establish Keough's legal action implicates their rights of free speech and to petition, we do not address the Pinkerton Defendants' complaint in issue two that the trial court erred by failing to grant their motion and finding that Keough had established the prima facie case for each essential element of his claims by clear and specific evidence. *See* Tex. R. App. P. 47.1.

The Pinkerton Defendants argue we should at least dismiss Keough's claims for violation of Texas wiretap laws, tortious interference with fiduciary duty, tortious interference with contract, tortious interference with prospective economic advantage, and intentional infliction of emotional distress, because Keough—not having had an opportunity to conduct discovery—conceded he could not provide the trial court evidence of those claims. But Keough was not required to produce any such evidence, because the Pinkerton Defendants failed to satisfy the first step of the TCPA's three-step framework. As a result, the burden never shifted to Keough to produce prima facie evidence of any of his claims. *See Lipsky*, 460 S.W.3d at 587. We conclude the trial court correctly denied the Pinkerton Defendants' TCPA

motion to dismiss Keough's claims, even those claims for which Keough conceded he had no evidence.

## CONCLUSION

Having determined that the Pinkerton Defendants failed to establish that Keough's claims are based on or in response to the exercise of their First Amendment rights of free speech and to petition, we conclude the trial court did not err by denying the Pinkerton Defendants' TCPA Motion to Dismiss those claims. Accordingly, we affirm the trial court's Order denying the Pinkerton Defendants' TCPA motion to dismiss.

AFFIRMED.

JAY WRIGHT
Justice

Submitted on February 12, 2026
Opinion Delivered March 26, 2026

Before Golemon, C.J., Wright and Chambers, JJ.